UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JEFFREY MILLAR,

            Plaintiff,

     v.                                          Case No. 09-cv-101-JPG

THE LAKIN LAW FIRM PC,
LAKINCHAPMAN, LLC, and BRADLEY
M. LAKIN,

            Defendants.

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants The Lakin Law Firm PC,

LakinChapman, LLC, and Bradley Lakin's (these parties will hereinafter be collectively referred

to as "Defendants") Motion for Partial Summary Judgment (Doc. 83).[1]  Plaintiff Jeffrey Millar

(hereinafter "Millar") filed a Response (Doc. 110), to which Defendants filed a Reply (Doc.

115).  In this memorandum and order, the Court also considers Defendants' Motion to Strike

(Doc. 111), to which Millar filed a Response (Doc. 119), as well as Defendants' Motion for

Sanctions (Doc. 113), to which Millar also filed a Response (Doc. 120).

For the following reasons, the Court, *inter alia*, **GRANTS** Defendants' summary

judgment motion.

## BACKGROUND

### I.      Facts

In analyzing a motion for summary judgment, the reviewing court must construe the

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences

_____

[1]While termed a motion for *partial* summary judgment, the instant motion
effectively operates as a motion for summary judgment, as the Court previously
dismissed the only count not targeted therein.  (*See* Doc. 121)

in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court, construing the evidence in the light most favorable to Millar and drawing all reasonable inferences in his favor, finds as follows:

Millar, an attorney licensed in the states of Illinois and Missouri, began working for Defendant Lakin Law Firm PC (hereinafter "Lakin Law" or "the firm") in May 2000.  On or about January 15, 2004, Millar met with Bradley Lakin (hereinafter "Lakin), the managing partner of the firm, and Steven Schweizer (hereinafter "Schweizer"), the chief operating officer of the firm.  At Lakin's initiative, the three discussed the possibility of Millar entering into a written employment agreement with the firm.  Schweizer and Lakin provided Millar with a standard copy of the firm's contract for attorneys,[2] which he took under consideration for approximately one week due to concerns regarding the contract's 90-day termination provision.

Millar signed the contract[3] on or about January 20, thereafter making some handwritten

─────────────────

[2]The employment agreement included the standard boilerplate the firm used in contracts with its attorneys.  The contract given to Millar stated that it covered the term "commencing as of January 1, 2004 and ending December 31, 2004 . . . and shall automatically renew annually for an additional twelve-month period unless either party hereunder provides the other party hereunder of written notice of termination at least 90 days prior to the applicable termination date."  (Doc. 124, p. 3, ¶ 14).  It set forth Millar's base salary and provided for a class action bonus of 1 to 1.5% of the net fees "for those cases [Millar] has been personally assigned as the responsible attorney."  *Id*. at ¶ 15. This bonus compensation was capped at $200,000 annually.  Furthermore, in order to be entitled to the bonus compensation, Millar "must [have] be[en] employed with [Lakin Law] as of December 31st of each year in which [Lakin Law] received the fee."  *Id*.  The employment agreement specified Illinois law as the governing law.

[3]Until Section III of its "Analysis," the Court uses the terms "contract" and "agreement" interchangeably.  Of course, whether a contract actually existed between Millar and Defendants is the primary subject of the instant motion.

changes in front of either Lakin or Schweizer.[4]  That same day, Millar gave the contract to
Schweizer, who indicated that he would have Lakin sign it because he was the only individual
authorized to execute employment contracts for attorneys on behalf of the firm.  Millar had no
reason to believe that Schweizer would not give the contract to Lakin or that Schweizer would
mislead him in that regard; rather, Millar was of the understanding that Lakin would be signing
the contract.  Likewise, Millar never requested nor received a fully executed copy of said
contract, again relying on his trust in Schweizer and Lakin.

    However, Lakin outright denies seeing a version of the contract with Millar's signature.
He maintains that he did not sign the contract and did not authorize anyone to sign it on his
behalf.  Both Schweizer and Marilyn Leuty (hereinafter "Leuty"), the office manager of Lakin
Law, deny ever seeing a fully executed contract or copy thereof.  Meanwhile, Lakin does
acknowledge that he signed employment contracts for other attorneys in September 2003
(Richard Burke and Gary Peel) and August 2004 (Paul Marks).  Further, it is undisputed that
Millar received six annual salary increases during his tenure with the firm, two of which came
after 2006.  Millar also received bonus checks signed by Lakin within the 1-1.5% range provided
in the contract that he signed.

    In August 2005, Millar and his then-wife, Amber Millar (hereinafter "Amber"), instituted
divorce proceedings.  In response to discovery requests from Amber, Millar approached Leuty in
mid-February 2006 and requested information relating to his employment with the firm.  After
searching Millar's personnel file, Leuty informed him that there was no written contract

---

[4]Due to an understanding with Lakin that his base salary would be raised from
$60,000 to $65,000, Millar noted on the contract that his class action bonus would be
reduced from 1-2% to 1-1.5% of certain net fees.

regarding his employment with Lakin Law.  Around the same time, Millar asked Schweizer for a

copy of his contract.  Unable to locate the contract, Schweizer told Millar that "we'll go forward

as if there's no contract, from that point going forward."  (Doc. 83-1, p. 32).  Believing that

Schweizer had authority to act on behalf of Lakin and the firm, Millar responded, "okay," as that

was "fine with [him]."  *Id*. at p. 33-34, 60.  Millar's understanding was that this exchange lifted

the terms of the 2004 contract, including his bonus range.[5]  Millar subsequently authorized in

writing the release of employment information to Amber.  Upon receiving the discovery

requests, Leuty informed Amber, in a letter dated August 1, 2006, that no employment contract

existed between Millar and the firm.  In fact, throughout his divorce, Millar did not represent that

a written contract existed between him and the Lakin law firm, instead explaining "what Mr.

Schweizer told [him], . . . that [Schweizer ] tried to find [the contract], and he couldn't locate it."

*Id.* at 60.

In May 2006, a federal indictment was brought against Thomas Lakin, father of

Defendant Lakin, on sex and drug charges.  Lakin Law thereafter terminated the employment of

Richard Burke,[6] supervising attorney of the firm's class action department, and named Robert

---

[5]This was Millar's understanding of events at least until late 2008.  Around that
time, Lakin orally mentioned, at least once, to Millar his "agreement" with the firm,
which Millar understood to be the 2004 contract.  Also, on December 29, 2008, Lakin
sent an e-mail to Millar, wherein Lakin stated, "As to why [a] 1% [bonus on a specific
class action case taken on by the firm]?  That was the agreement you and the firm
reached on Jan 20, 2004 when you agreed to decrease your bonus percentage range of 1-
2% to 1-1.5% in exchange for your salary increase above and beyond what we had
already given."  (Doc. 110-14).  In his affidavit, Lakin explains that his use of the word
"agreement" was in reference to the conversation Schweizer had with Millar on January
20, 2004.

[6]Burke went on to file a lawsuit against Defendants that ultimately ended in
settlement.  *See Burke v. The Lakin Law Firm PC*, Case No. 07-cv-76-MJR (S.D. Ill. Jan.
29, 2007).

Schmeider as his successor.  Millar holds that he became the *de facto* supervisor or lead of the firm's class action department around the same time, a position neither the firm nor Lakin formally recognized.  Specifically, Millar maintains that, in light of the firm's numerous troubles, he took on the important role of "marshalling [sic] and firing up the [class action] cases . . . [a]nd would also have – sort of the colloquialism of the go-to guy [or] would [advise] many attorneys of how to do things in certain cases."  (Doc. 83-1, p. 22).  However, Millar performed very few, if any, administrative functions for the firm's class department.

During the period of Millar's employment with Lakin Law, the firm offered a group health insurance plan in which Millar participated.  In November 2007, Defendants switched the group health insurance provider from Aetna to United HealthCare, which offered reduced coverage.  Millar's son has an extremely rare metabolic condition that requires him to take oral neurotransmitter precursor medications six times a day.  The medication is expensive and difficult to obtain but necessary to prevent Millar's son from suffering brain damage or death.  Defendants have been aware of Millar's son's condition since shortly after his birth in 2003.  United HealthCare initially refused to cover Millar's son's medication.  In February 2008, after Millar threatened litigation, United HealthCare began covering the medication, at additional expense to the group health plan.  Shortly thereafter, Defendants began to accuse Millar of excessive absenteeism and faltering work performance.

On October 2, 2008, or 91 days before Millar's termination from the firm, Schweizer sent an e-mail to Millar, wherein he stated as follows:

> Brad [Lakin] told me that you and he discussed the fact that the class action bonus computation would be changing at the beginning of the year. . . . I had this down on my follow ups to officially notify you that the current bonus computation system or agreement we have will be terminated as of the end of the year.  I also understand that Brad is working on a revised system on a going forward basis.

5

(Doc. 83-2, p. 6).  Then, on December 29, Millar was called into a meeting with Lakin, Schweizer, and Charles Chapman, and he was told that his employment was terminated.  The last payment of Millar's base salary was made on December 30, 2008, which represented his last two weeks of work.

On December 19, 2008, [Defendant] LakinChapman LLC (hereinafter "LakinChapman"), which Millar contends to be the successor-in-interest to Lakin Law, received its articles of incorporation; however, LakinChapman did not begin providing legal services until January 1, 2009.  Millar never filled out an application or governmental withholding form as an employee of LakinChapman, although, again, Charles Chapman was present when he was officially notified of his termination.

On February 1, 2009, Millar rebounded from his termination at Lakin Law by taking a co-managing attorney position with the law firm of Brent Coon & Associates (hereinafter "Brent Coon"), where he remains employed.  At Brent Coon, Millar's annual salary is $125,000, and he is eligible for a bonus of 10% of legal fees on cases that he brings to the firm.  He also enjoys healthcare benefits and potential profit sharing beyond his other compensation.  This is not to say that Millar's departure from Lakin Law did not bring financial difficulty alongside.  Specifically, from November to December 2008, Millar was denied insurance benefits by Defendants' insurer, resulting in unpaid medical claims that totaled approximately $1,600.  Millar's requests for reimbursement for medication would continue to be denied in January and February 2009, despite paying $1,508.08 in monthly COBRA premiums.  Millar also has not received full payment from his current insurance company for March 2009 through present.  Although these payments have begun, they do not account for any outstanding interest, which

stands at about $5,000.  Finally, Millar believes that he is owed class action bonus compensation for all cases on which he was personally assigned that settled after his departure from the firm.

## II.      Relevant Procedural Posture

On February 4, 2009, Millar filed suit in this Court against Defendants, alleging claims of breach of contract (Count I), violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* (Count II), *quantum meruit* (Count III), and violation of 29 U.S.C. § 1140 of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") (Count IV).[7] Millar filed an Amended Complaint (Doc. 77) on September 28, 2009, which not only amended the relief sought under ERISA but added one count of negligent spoliation of evidence (Count V) and one count of fraud (Count VI).

Upon motion by Defendants, the Court ultimately dismissed Count IV, Millar's ERISA claim, with prejudice.  (*See* Doc. 121).  As directed by the Court, Millar filed a second Amended Complaint (Doc. 124) on April 8, 2010, which made no substantive additions or deletions to the previous complaint.  The five remaining counts are therefore still at issue and are the target of the instant summary judgment motion.

Following a general overview of summary judgment, the Court will address the merits of disposition of each claim, as well as the merits of Defendants' motion to strike and request for sanctions.

---

[7]On January 26, 2009, Defendants filed a declaratory judgment action in the Circuit Court of St. Charles County, Missouri, seeking a declaration that Millar was an at-will employee, that no written employment contract existed, that Millar was discharged for cause, and that Lakin Law owes Millar no additional money or benefits.

## ANALYSIS

### I.       Summary Judgment Generally

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), or by "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Anderson,* 477 U.S. at 252.

### II.      Breach of Contract (Count I)

In order to successfully maintain a breach of contract claim, a plaintiff must establish the following elements: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005) (citation omitted).  Of course, as implicated by the first element, such a claim is premised on the

formation of a valid contract, which requires "offer and acceptance, consideration, and definite and certain terms." *Id*.

### A. There Is a Genuine Issue of Material Fact as to Whether a Fully Executed Contract Existed in Early 2004.

The Court's first task is to determine whether a reasonable jury could find that a valid and enforceable contract was created in early 2004 between Millar and Lakin and Lakin Law. This is obviously a point of great contention, as Lakin contends that he never signed any such contract and did not authorize anyone to sign one on his behalf. Further, Lakin, Schweizer, and Leuty aver that they have never seen a fully executed contract regarding Millar's employment with the firm, and Millar does not have a copy to support his claim that one exists or existed. However, at the summary judgment phase, the most important evidence on this issue is that Millar signed the contract, gave it to Schweizer, and was believably assured that Lakin would be signing it. This evidence supports the reasonable inference that Schweizer gave the agreement to Lakin, who would have thereafter signed it.

The reasonableness of said inference is supported by a host of other evidence. Most notably, Lakin's e-mail of December 29, 2008, to Millar directly references "the agreement [Millar] and the firm reached on Jan 20, 2004[.]" While Lakin attempts to explain away his use of the word "agreement," the word is undeniably ambiguous in light of Millar's version of events. Such ambiguity cuts in favor of the non-movant and supports the possibility that a contract was created in early 2004.

Other circumstantial evidence supports Millar's position as well. Millar received several raises with the firm, and his base salary never fell below the $65,000 provided in the contract. Likewise, Millar received numerous bonuses for his class action work, all of which came

9

between the 1-1.5% specified in his contract.  Also, the contract provided for 90-days notice prior to termination, and Defendants argue that such notice was given 91-days before his departure form the firm.  While the Court need not determine the sufficiency of such notice for the reasons discussed *infra*, the timing of such alleged notice is indeed curious and shows that Lakin was attempting to act in compliance with the contract's provisions.

Keeping in mind the standards of *Anderson* that create a general deference to the non-movant, the Court finds that there is a genuine issue of material fact as to whether a contract existed in early 2004 signed by both parties.

**B.      There Is No Genuine Issue of Material Fact that Millar Waived His Rights under the Contract in Early 2006.**

Assuming *arguendo* the Court found a contract was created in early 2004, Defendants raise waiver, *inter alia*, as a defense thereto.  As such, the Court must next decide whether a reasonable jury could hold that Millar did not waive his rights under the contract in early 2006.

**1.      Waiver Generally**

"A waiver is the intentional relinquishment of a known right.  There must be both knowledge of the existence of the right and an intention to relinquish it."  *Pantle v. Indus. Comm'n*, 335 N.E.2d 491, 496 (Ill. 1975); *Vaughn v. Speaker*, 533 N.E.2d 885, 890 (Ill. 1988); *Sexton v. Smith*, 492 N.E.2d 1284, 1287 (Ill. 1986).  Put another way, "[i]f [the plaintiff] has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979).  "The principles of waiver . . . support the notion that a party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for non-

10

compliance." *Id.*; *Wagner Excello Foods, Inc. v. Fearn Intern, Inc.*, 601 N.E.2d 956, 962 (Ill. App. Ct. 1992) (citation omitted).  However, "waiver does not necessarily imply that the party asserting it has been misled to his detriment."  *Vaughn*, 533 N.E.2d at 890.

With respect to the summary judgment context, "[w]here there is no dispute as to the material facts and only one inference can be drawn therefrom, it is a question of law whether the facts proved constitute [a waiver]."  *Pantle*, 335 N.E.2d at 494.  Likewise, "[w]hether sufficient facts have been presented to establish a waiver is a question of law."  *Batterman v. Consumers Ill. Water Co.*, 634 N.E.2d 1235, 1236 (Ill. App. Ct. 1994).

### 2.    Millar's Representations to Schweizer in Early 2006 Constituted an Effective Waiver.

The Court finds that Millar clearly, unequivocally, and decisively waived his rights, including that of enforcement, under the 2004 contract.  Specifically, when Millar told Schweizer in early 2006 that it was "okay" and "fine with [him]" to continue as if there was no contract, he waived all rights thereunder.  These responses, the former appearing to have been verbalized, are especially meaningful in light of the fact that Millar understood them as fully lifting the terms of the contract.  Taken as a whole, Millar's responses and understanding of the conversation with Schweizer equate to an express and intentional relinquishment that defines the doctrine of waiver.  This holding also comports with the policy enunciated in *Saverslak*.

The representations made by Millar throughout his divorce lend greater credence to a finding of waiver.  While the parties debate the exact evidentiary value of the position maintained by Millar during his divorce, particularly whether his representations therein constitute judicial admissions in the case at bar, the evidence is undeniably relevant and admissible as it relates to the mutually understood impact of Millar's "okay."  (*See* Doc. 95, p. 4)

11

("[A]t the time Plaintiff responded to [his ex-wife's] discovery requests, he was under the belief he was not working under a written employment contract because of information provided to him by the Defendants."). As foretold by *Batterman* and *Pantle*, the Court holds that sufficient facts exist to establish that Millar waived all rights under the 2004 contract and that only the inference of waiver may be drawn therefrom.

### 3.     Millar's Arguments against Waiver Are without Merit.

Millar makes a number of arguments to refute a finding of waiver, each of which may be summarily dismissed. First, he argues that he could not effectively waive his rights under the contract because Schweizer did not have the authority to create, modify, or terminate contracts on behalf of the firm. However, in making this argument, Millar reads an element into waiver that the common law does not require. As discussed at length in *Pantle*, waiver focuses solely on the holder of the right being waived and requires only his knowledge and intent, both of which were present in the instant case. Even if waiver required communication with one holding authority in order to be effective, the Court finds it probable that Schweizer had apparent authority,[8] if not actual or express authority, to act on the firm's behalf.

Millar next argues that, assuming waiver occurred, Defendants' post-waiver actions should estop them from raising such a defense. The doctrine of estoppel provides equitable relief to one who relies on the misrepresentation of another to his detriment. For Millar to establish estoppel, assuming that Lakin misrepresented that a written contract existed in 2008, he must show, *inter alia*, that the "truth respecting [said misrepresentation] . . . [was] unknown to

---

[8]During his conversation with Schweizer in early 2006, Millar thought that the chief operating officer had authority to act on behalf of Lakin and Lakin Law. Such justifiable reliance is a key ingredient of apparent authority. *See Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993).

[Millar] at the time [it was] made and at the time [it was] acted on by him . . . ." *Vaughn*, 533 N.E.2d at 890.  This he cannot do.  As an attorney, Millar knew or should have known whether his contract still remained viable or even existed in 2008.  At the very least, as an employee of Lakin and Lakin Law, he had the wherewithal to find such things out.  A simple e-mail to Lakin, Schweizer, or Leuty likely would have sufficed.  *See Pantle*, 335 N.E.2d at 495.  ("To prevail on the theory of estoppel it [is] incumbent upon the petitioner to prove that he . . . had no knowledge or *convenient means* of knowing the true facts.") (emphasis added).  Millar therefore cannot invoke equitable estoppel as a means of reviving the 2004 contract.

Finally, Millar contends that, assuming waiver occurred, Lakin's oral and written mention of the "2004 agreement" in 2008 served to ratify and/or reinstate the contract.[9] Ratification, which generally represents an affirmative defense, "seeks to affirm an otherwise invalid transaction based on independent, affirmative grounds."  *Monco v. Janus*, 583 N.E.2d 575, 583 n.2 (Ill. App. Ct. 1991); *see Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 259 (7th Cir. 1988).  "Conduct, including an acceptance of benefits under a contract, may be sufficient to constitute a ratification binding on the party accepting the benefits as if he had signed the contract."  *Bi-County Props. v. Wampler*, 378 N.E.2d 311, 316 (Ill. App. Ct. 1978); *see also Inland Land Appreciation Fund, L.P. v. County of Kane*, 800 N.E.2d 1232, 1239 (Ill. App. Ct. 2003) (discussing the relationship between the acceptance of benefits from a contract and ratification).  However, such conduct must "clearly evince[] an intent to abide and be bound by the act, *with full knowledge of it*."  *Hofferkamp v. Brehm*, 652 N.E.2d 1381, 1389 (Ill. App. Ct.

_____

[9]Millar further touts two raises he received after 2006 as evidence that the contract remained in effect.  However, the Court does not find occasional increases of an (at-will) employee's base salary to be unusual, let alone so unusual as to ratify a contract between the parties.

1995) (emphasis added).  Since the alleged ratification does not involve an invalid transaction, any principal-agent relationship, or any acceptance of benefits by Lakin, this case does not appear to fit the typical mold of ratification.  Moreover, the Court cannot reasonably infer Lakin had full knowledge that his mere mention of the 2004 agreement in 2008 would serve to ratify it. Again, Millar also argues in passing that Lakin reinstated the contract with his stance in 2008. However, the Court notes that reinstatement is typically confined to the realm of insurance law and requires knowledge and affirmative, often misleading, action on the part of the reinstator. For reasons discussed *supra*, these qualities are simply not present in the instant case.

In summation, the Court finds that no reasonable jury could hold that Millar did not waive his rights under the contract in early 2006.[10]

### C.   Due to His Waiver, Millar Became an At-Will Employee of Lakin and Lakin Law and Lost His Right to Sue under the Contract.

Following his waiver of the written contract, Millar became an at-will employee of Lakin and Lakin Law.  In other words, his employment was not subject to a fixed duration and was terminable at will by either party.  *Wood v. Wabash County*, 722 N.E.2d 1176, 1179 (Ill. App. Ct. 1999).  This reality, of course, negates the central premise of Millar's breach of contract claim, that he was entitled to 90-days written notice prior to termination.  His breach of contract claim is therefore without merit.[11]

---

[10]Due to its conclusion on the waiver issue, the Court need not discuss Defendants' argument that Millar is estopped from asserting any rights under the contract.

[11]Subsequently, the Court need not discuss the issues of whether Millar received sufficient notice of termination and/or whether Millar effectively mitigated his damages by taking employment with Brent Coon.

14

### III.      Illinois Wage Payment and Collection Act (Count II)

Millar next brings a claim under the Illinois Wage Payment and Collection Act (hereinafter "IWPCA"), 820 ILCS 115/1, *et seq*.  The IWPCA states, in relevant part, as follows: "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. . . ."  820 ILL. COMP. STAT. ANN. 115/5 (West 2010).  In other words, "an action under the [IWPCA] requires proof, inter alia, that: (1) the defendant was an 'employer' as defined in the [IWPCA]; (2) the parties entered into an 'employment contract or agreement'; and (3) the plaintiff was due 'final compensation.'" *Catania v. Local 4250/5050 of Commc'ns Workers of Am.*, 834 N.E.2d 966, 971-72 (Ill. App. Ct. 2005).

Unlike a breach of contract claim, a claim under the IWPCA need not necessarily be premised on a valid, enforceable contract.  This is because the definitional provision of the IWPCA explains that "'wages' [are] any compensation owed an employee by an employer pursuant to an employment contract *or* agreement between the two parties . . . ."  820 ILCS 115/2 (emphasis added).  "An 'agreement' is broader than a contract and requires only a manifestation of mutual assent [which may be made by words or by any other conduct] on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Zabinsky v. Gelber Group, Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004).  When acting consistently with an employment agreement, an employer and his employee "can set the material terms of the agreement, including the amount of compensation and the identity of the employer." *Landers-Scelfo v. Corporate Office Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005).

15

In the case at bar, the parties do little more than mention Millar's claim under the IWPCA. While the Court is not in the business of crafting arguments for counsel, certain determinations may be made as to this claim, especially in light of the Court's findings on the breach of contract issue. In his IWPCA claim, Millar seeks his base compensation for 2009, or, alternatively, full final compensation for 2008, which would only include his outstanding bonus compensation for that year.[12]  (*See* Doc. 124, p. 10-11, ¶ 43, 45).  Millar may not recover the former because, as an at-will employee, his employment with Lakin Law was properly terminated on December 29, 2008.  The latter, however, may not be disposed of so quickly.

As to the latter, the Court must first determine whether a post-waiver agreement existed between Millar and Defendants as to bonus compensation.   Despite his 2006 conversation with Schweizer, Millar continued to be paid a salary and bonuses in line with the 2004 contract.  This payment by Defendants and acceptance by Millar is illustrative of the conduct that is tantamount to an agreement under *Zabinsky* and *Landers-Scelfo.*  Schweizer's e-mail to Millar of October 2, 2008, referencing "the current bonus computation system or agreement," and Lakin's 2008 oral mention and explicit written acknowledgment of an "agreement . . . reached on Jan 20, 2004"

---

[12]The Court is satisfied that Millar received all of his base salary for 2008.  (*See* Doc. 83-2, p. 4).  Likewise, while Millar cites unpaid medical claims for 2008, approximately $1,600 total for November and December of that year, the Court fails to see how such claims involve Defendants, as opposed to Defendants' insurer, or are covered by the IWPCA.  *See* 820 ILL. COMP. STAT. ANN. 115/2 (West 2010) (defining "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties").

On the other hand, a plaintiff may be able to recover bonus compensation under the IWPCA.  *See Zabinsky v. Gelber Group, Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004); *but see Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (to be entitled to a bonus under the IWPCA, such compensation must typically be provided for in an employment contract).

further support this conclusion.  In short**,** the Court holds that, for purposes of the IWPCA, Millar and Defendants began operating under a *post-waiver agreement* with *terms of compensation* identical to those in the contract.[13]  While the enforceability of such an agreement is lower than that of a contract, the IWPCA allows for claims under both.

However, this is not the end of the matter.  For Millar to have been entitled to the bonus compensation at issue, he "must [have] be[en] employed with [Lakin Law] as of December 31st of each year in which [Lakin Law] received the [class action] fee," per the terms of the parties' agreement  (Doc. 124, p. 3, ¶ 14).  Millar's termination on December 29, 2008, two days before December 31, effectively negated any right he had to bonus compensation for that year or any time thereafter under the IWPCA**.**  In other words, no reasonable jury could find that Millar remains entitled to bonus compensation under the IWPCA, and his claim thereunder fails as a result.

## IV.  *Quantum Meruit* (Count III)

Assuming *arguendo* the Court found that he could not recover for breach of contract, Millar alternatively brought a claim of *quantum meruit*.  Literally meaning "as much as he deserves," *quantum meruit* contains the following three elements: "the performance of services by [plaintiff], the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation."  *First Nat'l Bank of Springfield v. Malpractice Research, Inc.*, 688 N.E.2d 1179, 1185 (Ill. 1997).  "*Quantum meruit* is used as an equitable remedy to provide restitution for unjust enrichment and is often pleaded as an alternative claim in a breach-of-contract case so that

---

[13]Millar's bonus percentage under this agreement would have been the 1-1.5% provided in the contract.

the plaintiff may recover even if the contract is unenforceable." *Weydert Homes, Inc. v. Kammes*, 917 N.E.2d 64, 73 (Ill. App. Ct. 2009).  While perhaps not always true, *quantum meruit* claims are almost exclusively brought by plaintiffs who have received *no* direct compensation for their services.  *See Barry Mogul and Assocs., Inc. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 251 (Ill. App. Ct. 1994) ("The theory of recovery in *quantum meruit* is that the defendant has received a benefit which would be unjust for him to retain *without paying for it*.") (emphasis added); *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990) ("The concern of *quantum meruit* is situations in which services are rendered, but *no payment forthcoming*.") (emphasis added).

Here, in his claim for *quantum meruit*, Millar does not contend that he went unpaid during his tenure with the firm; rather, he argues that he was not paid the reasonable value of his services in light of his role as the firm's *de facto* supervisor from 2007-2008.  Millar contends that a bonus percentage several points higher than the 1-1.5% rate he was paid would more accurately reflect the reasonable value of his services

The Court has a number of problems with this stance.  As discussed *supra*, the vast majority of *quantum meruit* doctrine is concerned with cases in which the defendant provided *no* compensation to an empty-pocketed plaintiff.  The instant case obviously does not comport with this body of precedent, as Millar was paid both a handsome base salary and bonus compensation through December 30, 2008.  As suggested by Defendants, if the Court were to buy into Millar's *quantum meruit* theory, any employee could hypothetically work for specific compensation and later claim that he should have been paid more post-termination.

While the Court acknowledges the necessity of assessing the reasonableness of an employer's payment, lest even a nominal payment would circumvent the unjust enrichment

principles underlying *quantum meruit*, there is nothing in this case to suggest that Millar's bonus compensation was unreasonable or made in bad faith.  Millar accepted bonuses within a specified range throughout his employment at Lakin Law, and he fully understood that Lakin did not wish to deviate from this range.[14]  The Court will not allow Millar to now act as a Monday morning quarterback on the issue.  Further, despite Millar's argument that his bonus is somehow linked to the industry standard,  "[t]he normal understanding . . . of bonuses . . . is that [they are] at the discretion of the employer . . . ."  *Brines v. XTRA Corp.*, 304 F.3d 699, 704 (7th Cir. 2002).  Accordingly, Millar's claim for *quantum meruit* must fail.

## V.    Negligent Spoliation of Evidence (Count V) and Fraud (Count VI)

Under Illinois law, to successfully assert a negligent spoliation of evidence claim, "a party must show that (1) the party alleged to have been negligent had a duty to preserve the evidence, (2) the party breached that duty, (3) the breach proximately caused an injury, and (4) the party seeking compensation for negligent spoliation suffered actual damages as a result." *Jones v. O'Brien Tire and Battery Serv. Ctr., Inc.*, 871 N.E.2d 98, 105 (Ill. App. Ct. 2007) (relying upon *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 n.1 (1995)).

---

[14]Millar's deposition testimony clarifies this point.  (*See* Doc. 83-1) (p. 39, "Q: And you had no other oral agreement as to the bonus structure or bonus that you received?  A: No."; p. 40, "Q: During your course of employment with the Lakin Law Firm, did you ever have a written agreement with either Brad [Lakin] or the [firm] for class-action bonuses to be 7% of the fees received by the [firm] less expenses?  A: No.  And that's – again, that's – that's where I was at the beginning of '08 and attempting to renegotiate the percentage, which ultimately was not."; p. 40, "Q: Who did you attempt to renegotiate the [bonus] percentage with in the beginning of '08?  A: It would be a matter of me trying to get a meeting with Mr. Lakin and bringing it up that way. . . . [However,] the second part of the plan on my part to increase the percentage did not come to fruition.").

Here, Millar's negligent spoliation claim is in relation to Defendants' alleged loss or destruction of the 2004 contract.  However, his waiver of the contract carries preclusive effect on the issue.  Even assuming that Defendants had a duty to preserve the contract and breached that duty by possibly losing or destroying it, Millar could not have been harmed thereby.  Specifically, Millar no longer had any rights under the contract upon waiver, which occurred before or at the same time as the alleged spoliation.  Moreover, Millar was paid a salary and bonus compensation entirely consistent with the contract during the remainder of his employment with the firm, casting serious doubt on whether he meets the actual damages requirement.  For these reasons alone, his negligent spoliation of evidence claim is rendered meritless, contains no genuine issues of material fact, and does not warrant further discussion by the Court.

Similar logic applies to Millar's fraud claim against Defendants.  Millar alleges common law fraud as to Schweizer's representation in 2006 as to the non-existence of a contract and as to Millar's references in 2008 to the 2004 agreement.  In Illinois, common law fraud has the following five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."  *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 496 (Ill. 1996).  Even assuming that Schweizer and/or Lakin engaged in fraud, Millar cannot show that he was damaged thereby.  He was paid under the terms of his contract, even when it was no longer in effect, during his employment with the firm.  Further, as discussed in the Court's *quantum meruit* analysis, he was entitled to no more bonus compensation than that which he received.  More simply, Millar's fraud claim hinged on the viability of his breach of contract and *quantum*

20

*meruit* claims, (*see* Doc. 124, p. 19, ¶ 85), both of which are meritless.  This claim too is therefore without merit.

## VI.     Defendants' Motion to Strike (Doc. 111)

Defendants filed a motion to strike certain exhibits to Millar's summary judgment response.  However, as the Court did not need to rely on these exhibits in reaching its findings regarding summary judgment, said motion is effectively moot.

## VII.    Defendants' Motion for Sanctions (Doc. 113)

Given the Court's rulings on Defendants' summary judgment motion, the Court may also consider Defendants' request for sanctions pursuant to Federal Rule of Civil Procedure 11 (hereinafter "Rule 11").  The primary purpose of Rule 11 is to deter unnecessary complaints and other filings throughout litigation.  Fed. R. Civ. P. 11 advisory committee's notes; *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998).  When filing a pleading, written motion, or other paper with the court, a party certifies that, to the best of his knowledge, his claims/defenses are warranted by existing law and that his factual contentions hold evidentiary support.  Fed. R. Civ. P. 11(b)(2)-(3).  In an effort to inhibit abusive litigation strategy, the Seventh Circuit applies a frivolousness test when considering Rule 11.  "An attorney takes a frivolous position if he fails to make a reasonable inquiry into facts (which later prove false) or takes a position unwarranted by existing law or a good faith argument for its modification."  *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1122 n.67 (7th Cir. 1992) (quoting *Magnus Elecs. Inc. v. Masco Corp.*, 871 F.2d 626, 629 (7th Cir. 1989)).

The Seventh Circuit has widely held that Rule 11 requires the application of an objective standard of reasonableness under the circumstances.  *Pac. Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 118 (7th Cir. 1994).  Courts are "expected to avoid the wisdom of hindsight and

21

should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed. R. Civ. P. 11 advisory committee's notes.

Here, as perhaps best evidenced by the sheer length of this memorandum and order, discerning the merits of Millar's remaining claims was no easy task. Doing so required a great deal of research and thought by this Court, and the Court is confident that Millar's counsel maintained a non-frivolous position with respect to all of her client's claims throughout this litigation. For this reason, the Court will deny Defendants' request for sanctions.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment (Doc. 83). Further, the Court **DENIES as moot** Defendants' Motion to Strike (Doc. 111) and **DENIES** Defendants' Motion for Sanctions (Doc. 113). Finally, the Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: June 17, 2010**

<u>s/ J. Phil Gilbert</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**